## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ALEXANDR ROMANOV,
an Individual Petitioner,

      Petitioner,

v.                         Case No. 3:21-cv-779-MMH-MCR

ANYA SOTO, an Individual
Respondent,

      Respondent.

_____

# <u>O R D E R</u>

**THIS CAUSE** is before the Court on the Verified Petition for Return of

Minor Children, Issuance of Show Cause Order and Provisional Measures (Doc.

1; Verified Petition) filed on August 11, 2021.   Petitioner Alexandr Romanov

(the Father) filed the Verified Petition pursuant to The Convention on the Civil

Aspects of International Child Abduction (the Hague Convention), Oct. 25,

1980, T.I.A.S. No. 11670, as implemented by the International Child Abduction

Remedies Act (ICARA), 22 U.S.C. § 9001, <u>et</u> <u>seq</u>.[1]   In the Verified Petition, the

Father requests the return of his minor children, M.R. and V.R. (the Children),

from the United States to Canada.   <u>See</u> Verified Petition at 8.   Respondent

---

[1]  ICARA was previously located at 42 U.S.C. § 11601.

Anya Soto, the mother of the Children (the Mother), filed an Answer (Doc. 18) to the Verified Petition on September 9, 2021.

At present, the Children are living with the Mother in Carlsbad, California, along with the Mother's wife, Lili Soto (the Stepmother) and her child (the Stepsibling).[2]   After an agreed upon period for discovery, the matter came before the Court for an evidentiary hearing on November 16-18, 2021. See Minute Entries (Docs. 45, 48, 49; Evidentiary Hearing).   The Father and Mother appeared in person with their counsel.   On the first day of the Evidentiary Hearing, the Court heard in-person testimony from both parties. See Minute Entry (Doc. 45).   In addition, the Court heard, via Zoom, the testimony of Steven Bookman and Jeff Rechtshaffen, the Canadian lawyers representing the Father and Mother, respectively, in the family law proceedings pending in Canada.   The Mother also presented the Stepmother's testimony via Zoom.   Id.   Both parties submitted various documentary exhibits which the Court admitted as evidence.   Id.

On the second day of the Evidentiary Hearing, the Court conducted in camera interviews of each Child individually, outside the presence of the parties

---

[2] At the time of filing, the Children were living with their Mother and Stepmother in Jacksonville, Florida.   As such, it is undisputed that the Court has jurisdiction over this matter pursuant to 22 U.S.C. § 9003(b).   See Order (Doc. 17) at 3 n.1.

or their counsel.[3]  See Minute Entry (Doc. 48).  The next morning, with the parties' consent, the Children were interviewed by a court-appointed child psychologist.   At the Father's request, and with the psychologist's recommendation, the Court then arranged for the Children to have an in-person visit with their Father.   This hour-long visit marked the first time the Children had seen their Father in person in over a year.   Following the visit, the Court reconvened the Evidentiary Hearing and provided the parties with an oral summary of the undersigned's interviews with the Children.   See Minute Entry (Doc. 49); see also Transcript Excerpt from Evidentiary Hearing (Doc. 53; Interview Summary Tr.), filed November 30, 2021.   Upon hearing the summary and after an opportunity to confer with their counsel, both parties declined to present any rebuttal evidence.   See Minute Entry (Doc. 49).   On December 6, 2021, the Court provided the parties with the report from the child psychologist, see Notice (Doc. 56), and on December 14, 2021, the parties filed their closing arguments.   See Petitioner's Closing Argument (Doc. 57); Respondent's Closing Argument (Doc. 58).   Accordingly, this matter is ripe for review.[4]

---

[3] The Court conducted the interviews in chambers with only the undersigned, a court reporter, a law clerk, and the undersigned's ten-year-old golden retriever, Hana, present in the room.

[4] The Court also implored the parties to consider mediation as a means of resolving this matter in a way that would be least damaging to the Children.   Nevertheless, the parties consistently took the position throughout this case that settlement was not possible.

## I.   Background

The Father is a Canadian citizen currently living in Toronto, Ontario, where he has lived for approximately twenty years.   He married the Mother, also a Canadian citizen, on January 15, 2008.   During their marriage, the parties lived in Canada and had two children, one of whom was born in 2008 and is now thirteen years old (V.R.), and the other of whom was born in 2012, and is currently nine years old (M.R.).   Like their parents, the Children are also Canadian citizens.   The parties separated in 2016, and subsequently divorced on May 27, 2019, in Canada.   The Mother then married Lili Soto, a United States citizen, on June 29, 2019.   At that time, the Mother, Stepmother, Children and Stepsibling lived together in the Mother's high-rise condominium in Toronto.

Following their separation, the parties entered into a Separation Agreement which is governed by Canadian law and remains in place to date. See Pet.'s Ex. 1-J at 118-143 (Separation Agreement).   Pursuant to paragraph 4.1 of the Separation Agreement, both the Father and the Mother have "joint custody" of the Children.   Under the terms of the Separation Agreement, the Mother has the "primary residence" of the Children, while the Father has regular timesharing including one night a week and every other weekend.   See Separation Agreement ¶¶ 4.2-4.3.   After the onset of the Covid-19 pandemic, the parties altered this timesharing arrangement and the Children rotated 10

consecutive days with the Father, followed by 20 consecutive days with the Mother.   Significantly, the Separation Agreement also requires agreement between the parties for "[a]ny and all travel outside of the country . . . ."   See Separation Agreement ¶ 4.7.   It is undisputed that prior to the events of this lawsuit, the Father was exercising his rights of custody under the Separation Agreement and Canadian law.

In August of 2020, the Mother asked the Father if he would consent to her taking the Children to the United States, specifically to Florida from January 4, 2021, until March 10, 2021.   See Pet.'s Ex. 3.   The Father agreed to this trip and contributed to the purchase of the Children's airline tickets.[5] Id.   However, a few months later, in October 2020, events transpired between the Father and Mother about which the Court received very little evidence. Although it is unclear what happened between the parties at that time, the result was that the Mother began refusing to allow the Father to see the Children and all direct communication between the parties ceased.   See Pet.'s Ex. 6.   At that time, the Mother also retained Canadian counsel to pursue, among other things, a change in the custody arrangements between the parties.

---

[5] The Mother and Children had taken a similar trip to Florida earlier in 2020, from March to May, with the Father's consent.   The Stepmother's extended family lives in Jacksonville, Florida.

Although the parties were not speaking, the Mother moved forward with the plan to take the Children to Florida on an extended vacation. However, unbeknownst to the Father, rather than depart in January as previously discussed, the Mother, Stepmother, Children and Stepsibling left Canada on December 13, 2020, and flew to Florida.[6]   In addition, on December 22, 2020, the Mother's Canadian counsel filed a petition on her behalf in the Canadian court seeking, among other things, sole custody of the Children.   See Pet.'s Ex. 1-A (December Petition).   Notably, the Mother did not include a request to change the Children's permanent residence in the December Petition nor did she acknowledge that the Children would be in Florida at the time of filing.[7] Id.   According to the Mother, it was still her intention at that time to return with the Children to Canada in the spring.   The Father did not learn that the Children had left the country until the end of December, through a text message

---

[6] The Mother and Stepmother testified that they decided to leave earlier than originally planned because Covid-19 cases were increasing and they feared that the Canadian border would close.   In addition, they explained that the Stepmother has multiple sclerosis and does not have access to health insurance in Canada, adding to their feeling of urgently needing to relocate amid the surging pandemic.   While the Court is sympathetic to these concerns, it bears noting that the Mother offered no explanation for her failure to notify the Father, or even his Canadian counsel, of her intention to remove the Children from Canada earlier than previously discussed, much less request his consent.   And concerningly, on December 18, 2020, the Father received a text message, purportedly from V.R., which falsely represented that the Mother and Children were still in Canada.   See Pet.'s Ex. 7.   No explanation was provided for this misrepresentation.

[7] The Mother appears to have signed the Petition on December 8, 2020, prior to their departure.   Even so, the Petition does not disclose that the Mother had plans to remove the Children from Canada in the immediate future.

exchange with V.R.   <u>See</u> Pet.'s Ex. 7.   At that time, despite the early departure, the Father retained hope that the Children would return to Canada in March of 2021, as previously agreed.

The Mother testified that while in Florida, the family monitored the pandemic conditions in Toronto and considered their plans week-by-week, until finally, in early May of 2021, they made the decision to sell the condominium where they had lived in Canada and remain in the United States permanently. It is undisputed that the Mother did not communicate with the Father about extending the Children's stay in the United States beyond March 10, 2021, and she did not have his consent to keep the Children in the United States past that date.   On May 28, 2021, the Mother's Canadian counsel filed a motion in the Canadian proceedings to amend the Mother's December Petition to add a request to permanently change the Children's primary residence to the United States.   <u>See</u> Pet.'s Exs. 1-F,G.

Shortly thereafter, the Father learned from his Canadian counsel that the Mother desired to remain with the Children in the United States permanently.   The Father opposed this request via an Affidavit which he filed in the Canadian proceedings on June 3, 2021.   <u>See</u> Pet.'s Ex. 1-I.   In his June 3, 2021 Affidavit, the Father stated that he had begun the process of pursuing a return remedy under the Hague Convention.   <u>Id.</u> ¶ 5.   The matter came before the Canadian court for a case conference on June 30, 2021, at which time

the court declined to take any further action until the conclusion of the Hague proceedings.   The Father then initiated this case under the Hague Convention with the filing of the Verified Petition on August 11, 2021.   See generally Verified Petition.   On August 25, 2021, the Father effected service of process on the Mother, via substitute service.   See Return of Service (Doc. 7), filed August 26, 2021.

As noted above, on August 21, 2021, after the Father filed the Verified Petition, but before service was accomplished, the Mother, Stepmother, Children, and Stepsibling moved to San Diego, California, two days before the start of the new school year.   They moved into a rental home in Carlsbad, California on September 11, 2021, where they are currently living.   The Children are attending school in California, have made friends there, and report being happy in their new home.

## II.    Prima Facie Case

### A. Applicable Law

The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  See Hague Convention, pmbl.  "The Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of

a more sympathetic court for custody hearings." See Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007).   As such, "[t]he court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." See Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004).   The Hague Convention "applies to children under sixteen years of age who are 'habitually resident' in a contracting state (Convention, Art. 4) and are 'wrongfully removed' to another contracting state (Convention, Art. 1)." Seaman v. Peterson, 766 F.3d 1252, 1257 (11th Cir. 2014).[8]  A removal or retention is "wrongful" within the meaning of the Hague Convention where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

See Hague Convention, Art. 3.   The petitioner bears the burden of establishing by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." See 22 U.S.C. §

---

[8] It is undisputed that both the United States and Canada are contracting states to the Hague Convention.   See Second Amended Pre-Trial Statement (Doc. 38) at 6-7.

9003(e)(1)(A).   If a petitioner establishes a wrongful removal or retention, then "the authority concerned shall order the return of the child forthwith," unless the respondent establishes one of the affirmative defenses enumerated in the Convention.   See Hague Convention, Art. 12; see also Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008).

## B. Discussion

To prevail on the Verified Petition, the Father must establish that: (1) the Children were "habitually resident" in Canada at the time the Mother retained them in the United States; (2) the retention was in breach of the Father's custody rights under Canadian law, and (3) the Father had been exercising those rights at the time of retention.   See Ruiz, 392 F.3d at 1251.   In this case, it is undisputed that the Father has custody rights with respect to the Children under Canadian law and that the Father was exercising those rights prior to the retention.   Likewise, it is undisputed that the Mother did not have the Father's consent to retain the Children in the United States after March 10, 2021.   As such, the Court finds that the Mother's unilateral decision to retain the Children in the United States after that date constituted a breach of the Father's custody rights under Canadian law.[9]   See Separation Agreement ¶ 4.7

---

[9] In her Closing Argument, the Mother contends that the Father cannot establish a prima facie case because he acquiesced to the Children's retention in the United States, negating the wrongfulness of the retention.   See Respondent's Closing Argument at 16. However, whether the Father acquiesced to the Children remaining in the United States after the wrongful retention is an affirmative defense under the Hague Convention and the Court

("Any and all travel outside of the country shall be agreed upon between the parties."). Additionally, the parties agree that the Children are under the age of sixteen and had continuously resided in Canada until 2020. <u>See</u> Second Amended Pretrial Statement (Doc. 38) at 6.

As to habitual residence, the Court notes that the Mother previously indicated an intention to contest a finding that Canada constituted the Children's habitual residence. <u>See</u>, <u>e.g.</u>, Respondent's Notice of Issues for Trial (Doc. 41) ¶ 3. However, in her closing argument, the Mother appears to have abandoned that argument. <u>See</u> Respondent's Closing Argument at 2-3, 16, 32-33. Nevertheless, to the extent any challenge to the Children's habitual residence remains, the Court finds that it is plainly Canada.

A child's habitual residence is judged from the time of the removal or retention. <u>See</u> <u>Monasky v. Taglieri</u>, 140 S. Ct. 719, 726-27 (Feb. 25, 2020) ("The place where a child is at home, <u>at the time of removal or retention</u>, ranks as the child's habitual residence." (emphasis added)); <u>see</u> <u>also</u> <u>Fuentes-Rangel v. Woodman</u>, 617 F. App'x 920, 921 (11th Cir. 2015). At the time of the retention in March of 2021, the Children had been in Jacksonville, Florida for only a few months, living temporarily in the home of the Stepmother's parents. During this period, the Mother admits that she was undecided as to whether they would

---

will address the Mother's argument in that context. <u>See</u> <u>Baxter v. Baxter</u>, 423 F.3d 363, 368 (3d Cir. 2005).

stay in Florida or return to Canada.   Indeed, according to the Mother, they did not decide until early May, after the date of the retention, that they would remain permanently in the United States.   Significantly, the Father was not included in that decision, nor did the Mother have his consent to permanently relocate the Children.   Moreover, after the retention, the Mother and Children did not stay in Jacksonville but moved across the country to California where they leased a new home in September of 2021.   Thus, to the extent the Children have developed attachments to the United States, those attachments are based on their schools, activities and friends in California and were formed only after the retention.   Based on the totality of the circumstances, the Court finds that, at the time of the retention, the Children's habitual residence remained in Canada.   See Monasky, 140 S. Ct. at 723 ("[A] child's habitual residence depends on the totality of the circumstances specific to the case.").[10]

In light of the foregoing, the Court finds that the Father has satisfied his prima facie burden under the Hague Convention.   As such, return of the Children is mandated under the Convention unless the Mother can establish an affirmative defense.   See Baran, 526 F.3d at 1344.

---

[10] Whether the Children have since become "well-settled" in the United States is not an issue in this case as the Father filed the Verified Petition within one year of the retention. See Convention, Art. 12.

### III.   Affirmative Defenses

### A. Applicable Law

As stated above, the Hague Convention also provides certain affirmative defenses to the return of a child.  See id. at 1344-45.  "These affirmative defenses are to be narrowly construed to effectuate the purposes of the Convention and, even if proven, do not automatically preclude an order of return."   Id. at 1345.   Two of the defenses require clear and convincing evidence:

> 1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place [the child] in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms."

Bader v. Kramer, 484 F.3d 666, 668 (4th Cir. 2007) (alteration in original) (quoting Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001)).   Two other defenses may be established by a preponderance of the evidence:

> (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country, and (2) that the petitioner was not actually exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal.

Id. at 668-69.  In addition, the Hague Convention authorizes the judicial or administrative authority to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."   See Hague

Convention, Art. 13.   Known as the mature child exception, "[t]he burden is on the retaining parent to establish by a preponderance of the evidence that this exception applies."   See Romero v. Bahamonde, 857 F. App'x 576, 583 (11th Cir. 2021) (citing 22 U.S.C. § 9003(e)(2)(B)).   Here, the Mother raises two affirmative defenses: acquiescence and the mature child exception.   See Respondent's Closing Argument at 16-31.[11]

### B. Discussion

#### a. Acquiescence

Although the Father has established a prima face case for return of the Children, the Court may decline to order their return if the Mother establishes by a preponderance of the evidence that the Father "subsequently acquiesced in the removal or retention."   See Hague Convention, Art. 13(a).   The defense of acquiescence is a narrow defense that turns on the subjective intent of the

---

[11] At the outset of her written Closing Argument, the Mother also appears to contend that whether the Father consented to the Children's removal from Canada is an issue in this case, although she presents no argument on this point in the remainder of her brief.   See Respondent's Closing Argument at 2, 16, 32-33.   However, the Father concedes that he agreed to allow the Children to visit Florida and despite the fact that they left prematurely, does not argue that their initial removal from Canada was wrongful.   See Petitioner's Closing Argument at 1-2.   The Father's prima facie case is premised on the contention that the Mother has wrongfully retained the Children in the United States after March 10, 2021.   See id.; see also Baxter v. Baxter, 423 F.3d 363, 370 (3d Cir. 2005) ("Article 3 proscribes wrongful removal and/or wrongful retention, as applicable.   The inquiry does not necessarily end with the petitioner's consent to the child's removal.   If the petitioner agrees to a removal under certain conditions or circumstances and contends those conditions have been breached, the court must also examine any wrongful retention claim.").   Significantly, the Mother does not argue, and indeed there is no evidence to suggest, that the Father ever consented to the Children remaining in the United States after March 10, 2021.   Thus, the Court considers only the Mother's argument that the Father's actions after the retention demonstrate his acquiescence.

parent who is alleged to have acquiesced.   See Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).   This defense is analytically distinct from that of consent in that "[t]he consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."   Id. The defense of "acquiescence has been held to require 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'"   Id. (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996)).   Although "[c]onsent need not be expressed with the same degree of formality," id., it is still important to consider what the petitioner actually contemplated and agreed to, including the nature and scope of any consent given, and any conditions or limitations placed on that consent. Id.   Significantly, "[t]he fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention."   Id.

The Mother maintains that after she retained the Children in the United States, the Father acquiesced to their remaining here "when he failed to renew the [C]hildren's passports."   See Respondent's Closing Argument at 16-17.   In support, the Mother asserts that on July 29, 2021, her Canadian counsel informed the Father's Canadian counsel that the Children's passports had

expired and needed renewal, which could only be accomplished with the Father's assistance.   <u>See</u> Resp.'s Ex. 24.   Paragraph 5.2 of the Separation Agreement provides that: "[the Mother] shall have the right to apply for passports or renewals of passports for the [C]hildren and the [Father] shall sign such application on its presentation to him."   According to the Mother, the relevant documents were delivered to the Father's Canadian counsel, but the Father never took the steps required to renew the passports.   The Father and his Canadian counsel testified that they do not recall receiving any communications about the passports, but the Mother maintains for various reasons that this testimony is not credible.   <u>See</u> Respondent's Closing Argument at 10-11.   The Court need not make a credibility finding on this issue because regardless, even if the Father received these communications and refused to authorize the renewal of the expired passports, this conduct does not demonstrate his acquiescence to the Children remaining in the United States.

As is evident from the record in the Canadian proceedings, the Father never made any formal statement or written renunciation of his rights. Indeed, just the opposite.   On June 3, 2021, the Father, through his Canadian counsel, filed an Affidavit opposing the Mother's May 28, 2021 request to permanently relocate the Children to the United States.   <u>See</u> Pet.'s Ex. 1-I.   In his June 3, 2021 Affidavit, the Father stated that he had begun the process of seeking the Children's return under the Hague Convention.   <u>Id.</u> ¶ 5.

According to the Verified Petition, the Father submitted a request for assistance under the Hague Convention to the Canadian Central Authority on June 18, 2021, and by August 11, 2021, the Father had filed the instant Verified Petition. See Verified Petition ¶ 6, Ex. A. Such prompt action to seek the Children's return undercuts any suggestion that the Father demonstrated a "consistent attitude of acquiescence" or that he subjectively intended for the Children to remain in the United States.

To the extent the Mother contends that the Father's failure to assist with the renewal of the Children's passports demonstrates his acquiescence, this argument is without merit. The Children's passports expired in July and August of 2021, well after March 10, 2021, when the Children were supposed to have returned to Canada. See Verified Petition, Ex. A. The Mother's evidence shows that her Canadian counsel requested the Father's assistance with the passports in an email dated July 29, 2021. See Resp.'s Ex. 24. At that point, the Mother had denied the Father access to the Children for over eight months, taken the Children out of the country prematurely without telling him, and retained the Children in the United States without his consent. Significantly, the Mother did not testify, nor does her counsel argue, that absence of a valid passport prevented the Children's return or that had the Father allowed her to renew the Children's passports the Mother would have

returned the Children to Canada.[12]   Thus, under these circumstances, even if the Father knowingly refused to assist with the renewal of the Children's passports, the Court cannot find from this refusal that the Father subjectively intended that the Children remain in the United States.   Given the Father's actions in the Canadian proceedings and his prompt efforts to secure the return of the Children through the Hague Convention, the Court finds that he unequivocally did <u>not</u> acquiesce to the retention of the Children in the United States.   <u>See</u> <u>Baxter</u>, 423 F.3d at 372 (finding no evidence of acquiescence where the father gave only limited and conditional consent, and upon learning of the retention, "vigorously objected and pursued his rights under the Convention").

### b. Mature Child Exception

Next, the Mother asserts that the Court should deny the Father's request for the return of the Children based on the mature child exception.   <u>See</u> Respondent's Closing Argument at 19-31.   Although the Mother argues that both Children meet this exception, the Mother maintains that even if it can only be applied to the older Child, V.R., the Court should avoid separating the closely bonded siblings and allow the younger Child, M.R., to remain in the United States as well.   <u>Id.</u> at 31-33.   The Father contends that V.R.'s stated reasons

---

[12] Notably, in the July 29, 2021 email, the Mother's Canadian counsel did not explain why the Mother wanted to renew the passports and made no suggestion that the Mother planned to return the Children to Canada once the passports were renewed.   <u>See</u> Resp.'s Ex. 24.

for not wanting to return to Canada are insufficient to constitute particularized objections under the Convention.   <u>See</u> Petitioner's Closing Argument at 15-16. He also maintains that giving weight to V.R.'s preference for California would reward the Mother for wrongfully retaining the Children.   <u>Id.</u> at 16-17.   As to M.R., the Father asserts that there is no evidence that this Child objects to return.   <u>Id.</u> at 18.   Because no other affirmative defense applies to M.R., the Father argues that the Court should exercise its discretion to return both Children to "further the aims of the Convention" and "keep the [C]hildren's strong bond intact . . . ."   <u>Id.</u> at 20.

In determining whether the mature child exception applies, courts consider three primary factors: "(1) whether the child is sufficiently mature; (2) whether the child has a particularized objection to being repatriated; and (3) whether the objection is the product of undue influence."   <u>Romero</u>, 857 F. App'x at 583.   As to the question of maturity, "[t]he Hague Convention does not provide guidance on what constitutes an 'appropriate' age and degree of maturity, and courts have resisted formulating a 'mature child' test or creating a bright-line age rule."   <u>De La Riva v. Soto</u>, 183 F. Supp. 3d 1182, 1199 (M.D. Fla. 2016).   However, a "child's age, ability to express mixed feelings, and to plan past obstacles" can all be indications of maturity.   <u>See</u> <u>Romero</u>, 857 F. App'x at 583.   With respect to the second factor, to determine whether a child has a particularized objection, "courts consider whether the child is expressing

merely a preference against return or is 'affirmatively objecting to returning to one country—when living in that country would be unacceptable.'"   Id. (quoting Rodriguez v. Yanez, 817 F.3d 466, 477 (5th Cir. 2016)).   And, as to undue influence, "courts place great weight on whether the objection is based on the child's firsthand experiences."   Id.   The burden is on the Mother, as the retaining parent, "to establish by a preponderance of the evidence that [the mature child] exception applies."   Id. at 583 (citing 22 U.S.C. § 9003(e)(2)(B)).

Significantly, as stated above, the existence of an affirmative defense, including this one, does not necessarily preclude an order of return.   Article 18 of the Hague Convention instructs that the provisions setting forth the mature child exception and other defenses, "do not limit the power of a judicial or administrative authority to order the return of the child at any time."   The Eleventh Circuit, like other circuit courts that have addressed the issue, interprets this language to mean that courts have "the discretion to order the return of a child despite the existence of an exception to return."   See Fernandez v. Bailey, 909 F.3d 353, 362-63 (11th Cir. 2018) (collecting cases). Thus, even if one or both of the Children voiced objections sufficient to meet the mature child exception, the Court in its discretion may order their return if doing so would further the aims of the Convention.   See Morales v. Martinez (In re S.L.C.), 4 F. Supp. 3d 1338, 1349-50 (M.D. Fla. 2014) (exercising discretion to return a 12-year-old child over her objection because return

"furthers the aims of the Hague Convention"); <u>Giampaolo v. Erneta</u>, 390 F. Supp. 2d 1269, 1285 (N.D. Ga. 2004) (exercising discretion to return 10-year-old child over her objection "in furtherance of the aims of the Hague Convention"). As summarized in <u>Fernandez</u>, these aims are: "'to secure the prompt return of children wrongfully removed or retained,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State.'" <u>See</u> <u>Fernandez</u>, 909 F.3d at 363. For the reasons that follow, the Court finds that the return of both Children is necessary here to further the aims of the Hague Convention.

### i. M.R.

The Court turns first to the younger child, M.R., who is presently nine-years old. As stated at the Evidentiary Hearing, M.R. is "sweet, reserved, cautious and quiet," as well as "very respectful," "brave," and "clearly quite bright." <u>See</u> Interview Summary Tr. at 5-6. During the interview with the undersigned, M.R. was reluctant to offer any opinion on where the Children should live and expressed the preference that someone else make that decision. <u>Id.</u> at 6. M.R. articulated the same preference in the clinical interview with the child psychologist the next day. Although M.R. would not state an opinion, M.R. does appear to prefer living in California. <u>Id.</u> M.R. has made friends there and enjoys being able to play outside in the warmer weather, whereas

M.R. recalls a cramped home in Canada and it being too cold to play outside. Id.

The Court has considered whether M.R. is sufficiently mature to fall within the mature child exception.  M.R.'s composure and thoughtfulness do indicate a certain level of maturity, but the Child's tender age and fragility were also evident, both from the Court's conversations with M.R. and from V.R.'s protective comments about her sibling.   Indeed, it would be difficult to find that M.R. is of sufficient maturity to bear the burden of making this difficult choice when even M.R. declined to shoulder that responsibility.   Ultimately, however, the Court need not make this determination because, even if sufficiently mature, there is no evidence that M.R. objects to returning to Canada.

While M.R. is plainly happy living in California, the fact remains that M.R. did not state any opposition to returning to Canada, much less an opinion strong enough to constitute a particularized objection.  Although the Court believes that M.R. would like to remain in California, on this record, the Court cannot conclude that M.R. finds the prospect of living in Canada to be "unacceptable."  See Romero, 857 F. App'x at 583.  As such, even if M.R. is of sufficient age and maturity—a point on which the Court has significant doubts—the mature child exception does not apply to M.R. because there is no basis in the record to find that M.R. has a particularized objection to repatriation.

In her Closing Argument, the Mother argues that the Court should find an "implied objection" in M.R.'s interviews with the Court and the child psychologist.  See Respondent's Closing Argument at 28-31.  The Court can make no such finding.  If M.R. is mature enough to meet the exception, as the Mother assumes, id. at 29, then M.R. is also mature enough for the Court to credit the Child's stated opinion—which M.R. affirmatively stated was that M.R. did not want to be the one to choose an outcome.  This is not a case where a child expressed a strong desire to remain in one country while stopping short of affirmatively objecting to the other in order to avoid hurting one parent.  Cf. Dubikovskyy v. Goun, No. 2:20-cv-04207-NKL, 2021 WL 456634, at *5 (W.D. Mo. Jan. 7, 2021) (finding an objection where the child "was reluctant to use the word objection because she did not want to make her father sad but there is no doubt based on her words and expressions that she does not want to return to Switzerland").  Rather, M.R. affirmatively stated, twice, that M.R. thought someone else should decide.  The only inference to be drawn from this statement is that, while M.R. likes living in California, M.R. does not view a return to Canada as an "unacceptable" outcome.  Likewise, the Court rejects the Mother's contention that M.R. would have objected had the Child realized that "lack of expression" might result in separation from V.R. and the Mother. See Respondent's Closing Argument at 30.  M.R. obviously and understandably did not want to be placed in the position of choosing between

family members and the Court declines to infer or speculate what M.R.'s choice might have been if M.R. had expressed it.   Regardless, as explained below, M.R. will not be separated from V.R.   And, whether M.R.'s return to Canada necessitates any separation from the Mother is a choice for the Mother to make.[13]

### ii. V.R.

The Court turns next to the older child, V.R., who is thirteen years old. V.R. is bright, well-spoken, poised, and respectful.   <u>See</u> Interview Summary Tr. at 3.   She was a delight to all who met her at the courthouse and exhibited an endearing air of protectiveness over her younger sibling.   V.R. has thoughtfully considered the question presented and unequivocally expresses her desire to

---

[13] The Court acknowledges that the Mother's return to Canada is complicated by her spouse's health condition.   <u>See</u> Respondent's Closing Argument at 15.   Nevertheless, there is no legal or cultural barrier to the Mother returning to Canada with the Children while the custody issues are addressed in the Canadian proceedings.   <u>Id.</u> (acknowledging that the Mother "could go with her children to Canada").   Whether she chooses to do so until the custody dispute is resolved is entirely up to her.   But she cannot avoid having to make this decision by expecting M.R. to instead choose between parents. That is too great a weight to place on the shoulders of such a young child.   <u>See</u> <u>Dalsgaard v. Montoya</u>, No. 8:11-cv-2204-T-23TGW, 2011 WL 5037223, at *8 (M.D. Fla. Oct. 24, 2011) ("'Forcing a child to choose between parents may be the ultimate Hobson's choice, particularly when massive geographic or cultural difference separate the parents.   I decline to impose that responsibility on this youngster.'" (quoting <u>In re Robinson</u>, 983 F. Supp. 1339, 1343-44 (D. Colo. 1997))). Nevertheless, the Court emphasizes that:

> [t]he effect of this Order is only to return the children to [Canada], and put the matter of custody before [a Canadian] Court of competent jurisdiction.   This Order does not determine custody or the long-term residence of the children. If [a Canadian] Court believes it is in the children's best interest to reside in the United States, it has the power to decide so.   For now, under the Hague Convention, repatriation is warranted.

<u>See</u> <u>Velozny ex rel. R.V. v. Velozny</u>, ___ F. Supp. 3d ___, 2021 WL 3115870, at *13 (S.D.N.Y. July 22, 2021).

remain in California.  Id. at 4.  V.R. has made friends in California, whereas she was bullied in Canada.  Id. at 3-4.  According to V.R., she has made progress with her self-esteem and fears that she would become depressed again if she returned to Canada.  Id. at 4.  V.R. is bonded with her Mother and Stepmother, but describes a strained relationship with her Father, and a particularly difficult relationship with her paternal grandparents who live in Canada.  Id. at 3-4.  V.R. expressed to both the undersigned and the child psychologist that she has no desire to live in Canada ever again.  Id. at 4. Neither the child psychologist nor the Court discerned any indication that V.R.'s views were the product of any intentional undue influence from the Mother.[14]

The Court has carefully considered its interview with V.R. and the report of the child psychologist and has no hesitation in finding that V.R. is sufficiently mature for the Court to consider her views.   However, whether her statements constitute the type of "particularized objection" sufficient to invoke the mature child exception is a closer call.   Although V.R. was confident and unequivocal in her opinions, courts vary in the weight they give to an objection that is based primarily on a preference for the friends, school, and home in the new country. Compare Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 278-79 (3d Cir. 2007)

---

[14] To the contrary, V.R. expressed the view that she knew little about the dispute between her parents.  According to V.R., the Mother has shared only the "bare minimum" because the Mother does not want V.R. to have a negative view of either parent.  See id. at 5.

(finding that the exception was not met where the 10-year old child expressed a preference for the United States because she liked her school and her house, and liked having friends and brothers); Velozny ex rel. R.V. v. Velozny, ___ F. Supp. 3d ___, 2021 WL 3115870, at *13 (S.D.N.Y. July 22, 2021) (finding 12-year old child's assertion that he would be "anxious and upset" if returned because he likes his school, friends and extended family was not a "substantial basis" for an objection and reflected merely his "enjoyment of his current lifestyle" in the United States) with de Silva v. Pitts, 481 F.3d 1279, 1287 (10th Cir. 2007) (finding that the exception was met where the 13-year old child wanted to stay in the United States because he thought his school here was better, he liked his house, and enjoyed his friends and activities); Dubikovskyy v. Goun, No. 2:20-cv-04207-NKL, 2021 WL 456634, at *4 (W.D. Mo. Jan. 7, 2021) (finding 12-year old child's objection to return sufficient where her reasons were based on her friends, sense of responsibility for her half-sister, bigger house, pets, and access to opportunities relevant to her goals). However, regardless of whether V.R.'s reasons for wanting to remain in the United States can constitute "particularized objections," the Court finds it necessary and appropriate to return the Children to Canada together.

### iii. Discretion

While the mature child exception could arguably apply to V.R., it does not apply to M.R.   Thus, absent the existence of an affirmative defense as to M.R.,

it appears the Hague Convention mandates M.R.'s return.   See Fernandez, 909 F.3d at 366 n.9 (noting that "[b]ecause of the Convention's preference for return, it does not give courts . . . discretion to deny return once it has been determined no exception applies").   To apply the mature child exception to V.R. would therefore place the Court in the untenable position of ordering the separation of these closely bonded siblings.   In the Court's view such an outcome would be significantly detrimental to the Children and should be avoided.   Indeed, both parties appear to recognize that separating the Children would be seriously detrimental to them, and the Court is certain that V.R. and M.R. would both strenuously object to their separation, regardless of where they might live. Unsurprisingly, both parties use the specter of separation to support their own positions—the Mother maintains that because V.R. objects, the Court should allow M.R. to remain as well, while the Father contends that because M.R. does not object, the Court should return V.R. as well.   See Respondent's Closing Argument at 31-32; Petitioner's Closing Argument at 18-20.

As to the Mother's argument, the Court acknowledges that some courts have declined to order the return of a sibling where an affirmative defense applies to one child but not the other.   See Ermini v. Vittori, No. 12 Civ 6100(LTS), 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013) ("Courts in this Circuit have frequently declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly

raise an affirmative defense under the Hague Convention.") aff'd by 758 F.3d 153, 167 (2d Cir. 2014) (concluding that it was not error for the district court to decline to separate the children but also finding that both children faced a grave risk of harm from abuse if returned); Broca v. Giron, No. 11 CV 5818(SJ)(JMA), 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013) (relying on the need to keep siblings together as part of the well-settled analysis); Sadoun v. Guigui, No. 1:16-cv-22349-KMM, 2016 WL 4444890, at *11 (S.D. Fla. Aug. 22, 2016) (denying return based on grave danger, mature child exception, and the need to keep siblings together); see also Ramirez v. Buyauskas, No. 11-6411, 2012 WL 606746, at *20 n.18 (E.D. Pa. Feb. 24, 2012); but see Raijmakers-Eghaghe v. Haro, 131 F. Supp. 2d 953, 957-58 (E.D. Mich. 2001) (finding court had no choice but to separate siblings where no affirmative defense was applicable to one of the siblings).   However, in those cases, the presence of other, compelling defenses meant that returning both siblings to the country of habitual residence was not a viable option.   Indeed, those cases involved serious allegations of abuse.   See Ermini, 758 F.3d at 164-65; Broca, 2013 WL 867276, at *3-5; Sadoun, 2016 WL 4444890, at *4-9.   The circumstances here are markedly different and as such, the Court questions whether the reasoning in those cases could extend to a case such as this where there is no evidence of abuse and the only applicable affirmative defense is the objection of one child.   Nevertheless, even if the Court had discretion to allow both Children to remain in the United

States, the Court is convinced that doing so under the circumstances of this case would undermine, rather than support, the purposes of the Hague Convention.

"It is the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'"  See Monasky v. Taglieri, 140 S. Ct. 719, 723 (Feb. 25, 2020) (quoting Hague Convention, pmbl); see also Abbott v. Abbott, 560 U.S. 1, 20 (2010).  Significantly, both parties appear to recognize that this custody dispute should be decided by the courts in Canada. Even after she brought the Children to the United States, the Mother filed her petition for sole custody, as well as her request to change the Children's permanent residence, in Canada.  The Mother appears to believe that the custody dispute can still be resolved in Canada while the Children live here, but this thinking is misguided.  See Respondent's Closing Argument at 28 (arguing that the Mother is not engaged in forum shopping because the custody proceedings remain pending in Canada).  If the Mother does not prevail in her petition with the Canadian court but nevertheless refuses to return the Children to Canada, it is unclear what remedy the Father would have absent the Hague Convention.[15]  And regardless, by prematurely moving the Children

---

[15] Nor would it have been advisable for the Father to have waited until the resolution of the Canadian proceedings to pursue his rights under the Hague Convention.  Such a delay would have provided a basis for the assertion of the well-settled defense, as well as strengthened the Mother's arguments on acquiescence and the mature child exception.

to the United States, the Mother has not only prevented the Father from exercising his custodial rights, but also put her thumb on the scale in favor of her desired outcome.  Even aside from the pandemic, life in the picturesque, oceanside city of Carlsbad, California presents the Children with a climate and opportunities quite different than their home in Toronto, Canada.  As is already evident in this case, the longer the Children remain in the United States, the more they become comfortable and settled in living here, and the stronger the argument becomes that it is in their best interests to remain here. Thus, return of the Children is necessary to allow the Canadian courts to fairly consider the custody dispute between the parents without exacerbating the impediments and concerns created by the Children's geographic dislocation. Moreover, allowing the Children to remain here pending the outcome of the Canadian custody proceedings would frustrate a central aim of the Convention—the prompt return of wrongfully retained Children to the country of their habitual residence.

In addition, despite V.R.'s stated objection, the Court, with some regret, makes the difficult finding that it is appropriate to exercise its discretion to return both of the Children to Canada together.  To do otherwise in this case would reward the wrongful retention and "signal that a parent might escape the Convention by running out the clock until the wrongfully retained child became accustomed to her new home."  See Garcia v. Pinelo, 808 F.3d 1158,

1169 (7th Cir. 2015).   Here, to the extent the Children have developed an objection to return, it is predominately based on the happiness they have found in California.   The Children like their home, the climate, their friends and their schools in California.   It bears noting, however, that the Children did not move to California until August 21, 2021, five months after they should have returned to Canada.   Moreover, any preference stated by the Children during their November 17, 2021 interview for remaining in California is based on attachments formed in only the three months they had been living there, all while this lawsuit was pending.   Refusing to return the Children under these circumstances would reward the decision to wrongfully retain the Children and encourage parents to evade or extend Hague proceedings for as long as possible in the hopes that a child will grow attached to her new home and object to repatriation.   See Pinelo, 808 F.3d at 1169; Tsai-Yi Yang, 499 F.3d at 280.

In light of the foregoing, the Court is convinced that to serve the aims of the Hague Convention the only appropriate outcome is to order the return of both Children to Canada.   Failing to do so would create an incentive for delay, reward the ongoing wrongful retention, and disregard the Father's rights of custody under Canadian law.   As the country of habitual residence, Canada is the country empowered to resolve the custody dispute between the parents and the return of the Children to Canada is necessary to allow that process to

continue and to assure the jurisdiction of the Canadian courts.   Accordingly, the Father's Verified Petition is due to be granted.

### IV.   Conclusion

Although much of what transpired in the relationship between the Mother and Father is unclear, it is apparent to this Court that both parents love their Children.   As such, the Court was hopeful that the parties could reach a resolution outside the Court process that would secure both the rights of the parents and the best interests of the Children.   Nonetheless, as attempts at compromise have failed, the Court is called upon to decide this matter within the limited confines of the Hague Convention.   In making that determination the Court must not, and indeed cannot, consider what seem to be critical questions such as the merits of the parties' custodial disputes, which parent might provide a better, more stable home, or where the Children might have the best opportunities.   The questions presented to the Court under the Hague Convention are far more discrete and, in the end, boil down to which country's laws should resolve those critical questions.   Here, it is Canada, the country of the Children's habitual residence, that must resolve those questions, and the Children must return to Canada to effectuate the resolution ordered by the courts of Canada.

The Court recognizes that the Mother does not appear to have acted with bad motive.   She faced difficult choices due to her wife's serious health

condition, the global pandemic, and the Children's apparent happiness in the United States.   But, whatever her motives, the fact remains that the Mother retained the Children in this country without the Father's consent and in disregard of his custody rights.   This is precisely the type of conduct the Hague Convention was implemented to deter.   In keeping with the purposes of the Convention, the Court will grant the Verified Petition and order the return of the Children to Canada to allow the country of habitual residence to resolve the ongoing custody dispute between the parties.

The Court concludes by noting that in finding that the Children must be returned to Canada, the Court expresses no opinion as to what the best interests of the Children ultimately may be, such a determination is left to the courts of Canada.   However, the Court is hopeful that despite what transpired in the past, both the Mother and Father will put the best interests of the Children first and come to an agreement that will allow the Children to continue to grow up knowing and benefitting from the love and presence of both of their parents.   In light of the foregoing, it is

**ORDERED:**

1. The Verified Petition for Return of Minor Children, Issuance of Show Cause Order and Provisional Measures (Doc. 1) is **GRANTED**.

2. On or before **February 18, 2022**, counsel for the parties shall confer and file a joint proposal on the logistical means by which the Children

will be promptly returned to Canada, taking into account that the Children's passports are expired and addressing any pandemic-related travel restrictions between the United States and Canada.

3. To facilitate the return of the Children, counsel for Respondent shall promptly deliver the Children's travel documents to counsel for Petitioner.

4. The travel restrictions set forth in the September 3, 2021 Order (Doc. 17) shall remain in full force and effect until further order of this Court.   The Mother is cautioned that any attempt to circumvent the requirements of this Order will risk a finding of contempt of court and imposition of sanctions.

5. Petitioner shall have up to and including **February 28, 2022**, to confer with opposing counsel and file any motion to recover necessary expenses incurred in this action pursuant to 22 U.S.C. § 9007(b)(3).[16]

---

[16] Pursuant to 22 U.S.C. § 9007(b)(3):

> [a]ny court ordering the return of a child pursuant to an action brought under section [9003] of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

6. The Clerk of the Court is further directed to enter judgment in accordance with this Order, but the case shall remain open pending further order directing how the Children are to be returned to Canada.

**DONE AND ORDERED** in Jacksonville, Florida this 7th day of February, 2022.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record